UNITED STATES of America, Plaintiff–Appellee,

v.

**Larry D. HALL, Defendant–Appellant.**

No. 97–4032.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 10, 1998.

Decided Jan. 19, 1999.

Rehearing and Suggestion for Rehearing En Banc Denied Feb. 16, 1999.

Lawrence S. Beaumont (argued), Office of United States Attorney, Urbana Division, Urbana, IL, for Plaintiff–Appellee.

Craig H. DeArmond, Kurth & Dearmond, Danville, IL, David B. Mote (argued), Office of Federal Public Defender, Springfield, IL, Richard H. Parsons, Office of Public Defender, Peoria, IL, for Defendant–Appellant.

Before COFFEY, EASTERBROOK, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

This matter comes before us for the second time. The facts and circumstances of the underlying case are fully set forth in *United States v. Hall*, 93 F.3d 1337 (7th Cir.1996) ("*Hall I*"), and we will only briefly discuss them here. Jessica Roach was last seen at approximately 3:30 p.m. on September 20, 1993, riding her bicycle near her home in Georgetown, Illinois. On November 8, 1993, Jessica's decomposed body was discovered in a cornfield near Perrysville, Indiana, a few miles from Georgetown. In late 1994, Larry D. Hall came under police suspicion in this case after the police questioned Hall regarding his stalking of other teen-aged girls in 1993 and 1994. In the course of the ensuing police investigation,

Hall made admissions about his involvement in Jessica's disappearance and, ultimately, signed a written confession admitting he kidnapped and murdered her.

Prosecutors charged Hall in a one-count indictment with the offense of kidnapping Jessica Roach for the purpose of his own sexual gratification and wilfully transporting her from Illinois to Indiana in violation of federal law. A jury convicted Hall, and the district court sentenced him to a term of life imprisonment. On August 27, 1996, this Court vacated Hall's conviction and remanded the case for a new trial on the ground that the district court improperly excluded expert testimony regarding false confessions without first testing the proffers under the standards of Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *See Hall*, 93 F.3d at 1346.

Hall was retried, and, a jury once again convicted him. Hall now appeals from that conviction on numerous grounds. He argues that: (1) the district court improperly excluded expert testimony relating to the reliability of eyewitness identification; (2) the district court erroneously excluded hearsay evidence implicating other suspects; (3) the government, in its opening statement, improperly commented on potential defense alibi witnesses thereby depriving Hall of a fair trial; (4) the district court improperly admitted expert evidence relating to characteristics of sex offenders offered to rebut Hall's proffer of psychiatric evidence that he suffered from certain personality disorders which made him prone to confess to a crime he did not commit; and (5) the district court improperly precluded Hall from introducing exhibits during the government's case-in-chief. Because we find these arguments unpersuasive, we affirm Hall's conviction.

I. EXCLUSION OF EXPERT TESTIMONY REGARDING THE RELIABILITY OF EYEWITNESS IDENTIFICATION

Hall's first challenge is that the district court abused its discretion in excluding expert testimony concerning the reliability of

eyewitness identification. The conviction in this case was aided by the testimony of three eyewitnesses who placed Hall in the approximate location of the crime the day before it was committed and the testimony of another eyewitness who saw Hall exit a cornfield in which the victim's body was later found. Seeking to challenge the reliability of these eyewitness identifications, Hall filed a motion requesting that the district court permit him to present expert testimony from Dr. Gary L. Wells, a professor of psychology at Iowa State University. Dr. Wells' testimony would have commented on the scientific bases for eyewitness identification and on those factors that give rise to suggestiveness and the likelihood of mistaken identification.[1] Subsequently, the district court held a hearing during which these eyewitnesses testified at length and during which the district court considered arguments on Hall's motion to admit Dr. Wells' testimony. Although Hall was prepared to offer testimony from Dr. Wells at that hearing, the district court ruled that Dr. Wells need not testify. The district court explained that even though Dr. Wells "appear[ed] to be qualified as an expert in the field of eyewitness identification, memory and recall, his testimony would not aid the trier of fact under Rule 702, and that appears to be the controlling law in the Seventh Circuit." Consequently, the district court denied Hall's motion. Hall now appeals that ruling.

When a party challenges the acceptance or rejection of expert scientific testimony on appeal, this Court first undertakes a *de novo* review of whether the district court properly followed the framework set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *See United States v. Yoon*, 128 F.3d 515, 527 (7th Cir.1997); *Hall*, 93 F.3d at 1342; *Bradley v. Brown*, 42 F.3d 434, 436 (7th Cir.1994). Upon a determination that the district court properly applied the *Daubert* framework, the district court's decision to admit or exclude expert testimony is reviewed only for an abuse of discretion. *General Elec. Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 517, 139 L.Ed.2d 508 (1997); *Target Mkt. Publ'g, Inc. v. ADVO, Inc.*, 136 F.3d 1139, 1143 (7th Cir.1998). As such, a trial court has broad discretion under Rule 702 of the Federal Rules of Evidence to admit or exclude evidence, and its ruling will not be reversed absent an abuse of that discretion. *United States v. Larkin*, 978 F.2d 964, 971 (7th Cir.1992); *United States v. Hudson*, 884 F.2d 1016, 1023–24 (7th Cir.1989).

As stated above, in reviewing the district court's application of Rule 702, we first must consider whether the district court followed the standard set forth in *Daubert*. In *Daubert*, the Supreme Court established the approach a district court must take in determining the admissibility of expert scientific testimony under Rule 702. The text of Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Focusing on the language of Rule 702, the Supreme Court concluded that when faced with a proffer of expert scientific testimony, a district court must determine "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592, 113 S.Ct. 2786.

We have interpreted *Daubert* as requiring a district court to conduct a two-step analysis when a party proffers expert scientific testimony. *See Yoon*, 128 F.3d at 527; *Wintz v. Northrop Corp.*, 110 F.3d 508,

---

1. Specifically, Dr. Wells' testimony would have purported to show: (1) that a weak correlation exists between witness confidence and the reliability of an identification; (2) the effect of stress upon identification; (3) that pooling of information by eyewitnesses can impact the memory of an individual witness; (4) the effect of a phenomenon called "photo bias identification" and a mental process called "blending" on the identification by a witness that participated in the creation of a composite drawing; (5) the psychological factors involved in the photographic lineup process that lead to suggestibility; (6) the constructive process involved in memory; (7) the effect of time on memory as it relates to. identification; and (8) the effect an initial identification from a photo spread can have on that witness' later identifications and memory.

512 (7th Cir.1997); *Hall*, 93 F.3d at 1341; *Porter v. Whitehall Labs., Inc.*, 9 F.3d 607, 614–16 (7th Cir.1993). First, when faced with a proffer of expert scientific testimony, the district court must "consider whether the testimony has been subjected to the scientific method; it must rule out 'subjective belief or unsupported speculation.'" *Porter*, 9 F.3d at 614 (citation omitted). This step requires that the district court determine "whether the reasoning or methodology underlying the testimony is scientifically valid." *Daubert*, 509 U.S. at 592–93, 113 S.Ct. 2786. Second, the district court must "determine whether the evidence or testimony assists the trier of fact in understanding the evidence or in determining a fact in issue." *Porter*, 9 F.3d at 616. This second step requires that the district court consider whether the proposed scientific testimony fits the issue to which the expert is testifying. *Daubert*, 509 U.S. at 591, 113 S.Ct. 2786; *Gruca v. Alpha Therapeutic Corp.*, 51 F.3d 638, 643 (7th Cir.1995); *Porter*, 9 F.3d 607 at 616. In other words, a district court may admit expert testimony *only* if such testimony will assist the trier of fact to understand the evidence or to determine a fact in issue.

On appeal, Hall essentially argues that the district court believed it had no discretion under the law of this Circuit to admit expert testimony regarding the reliability of the eyewitness identifications, and, therefore, the district court erroneously excluded Dr. Wells' testimony. Because we conclude that the district court conducted a proper inquiry under *Daubert* and Rule 702 and because we find that the district court properly exercised its discretion in precluding Hall's proffer of Dr. Wells' testimony, we reject Hall's argument.

### A. *The District Court Properly Applied the Daubert Framework*

■ Hall contends that the district court believed it had no discretion to allow expert testimony regarding the reliability of eyewitness identifications. For this reason, Hall submits the district court excluded Dr. Wells' testimony without properly testing the prof-

fer under the framework set forth in *Daubert*. Relying heavily on our decision in *Hall I*, Hall argues that the district court failed to make the requisite preliminary findings as to the reliability and helpfulness of Dr. Wells' testimony as required by *Daubert* and the law of this Circuit.

In *Hall I*, we reversed Hall's earlier conviction on the basis that the district court did not apply the proper *Daubert* framework in evaluating Hall's proffer of an expert on false confessions. *Hall*, 93 F.3d at 1346. In reaching that conclusion, we stated that "[t]he judge never mentioned *Daubert* specifically, and thus he never focused on the individual questions that must be answered. The only thing that is clear is his conclusion that the testimony would not assist the jury in its task." *Id.* at 1342. As a result, we concluded "[t]he district court's failure to test the [expert] proffers under [the *Daubert*] framework may have led to the exclusion of critical testimony for Hall." *Id.* at 1346. Therefore, we reversed and remanded for a new trial. *Id.* In this case, however, our review of the record indicates the district court adhered to the framework set forth in *Daubert* in reaching its decision to exclude Dr. Wells' testimony.

As an initial matter, the record plainly reveals that the district court recognized the applicability of *Daubert* to the task at hand. At the hearing conducted by the district court, the *Daubert* standard was discussed at length.[2] Furthermore, it is equally evident from the record that the court recognized that *Daubert* required it to determine whether the proffered testimony was scientifically valid and whether such testimony would assist the trier of fact.

■ With respect to the first prong under *Daubert*, the district court correctly noted that the scientific theories underlying Dr. Wells' testimony must be found to be scientifically valid in order for his testimony to be admissible as scientific knowledge under Rule 702. However, because the government challenged Dr. Wells' testimony solely on the basis that it would not assist the trier of

---

**2.** In fact, by our count, the district court and the parties referenced the *Daubert* case by name no less than fifteen times during the course of the hearing.

fact—the second prong of *Daubert*—the district court assumed, as do we, that the proposed testimony qualified as scientific knowledge under *Daubert* and Rule 702.[3] Because the district court presumed the scientific reliability of Dr. Wells' testimony, a claim that the court failed to conduct a proper inquiry under the first prong of *Daubert* and Rule 702 cannot form a basis for reversing Hall's conviction in this case.[4]

The district court recognized that this Court's presumption against admission of expert testimony on eyewitness identifications stemmed from our concerns about whether such expert testimony would actually assist the trier of fact, rather than about its reliability. For this reason, the district court focused its attention primarily on the second inquiry under *Daubert*. The record reveals that the court properly inquired as to how Dr. Wells' testimony would "assist the trier of fact" in understanding the eyewitness evidence in this case. When counsel for Hall proceeded to present Dr. Wells' qualifications in response to the district court's inquiry, the court interrupted stating, "[c]ounsel you're not addressing the issue that concerns me. If you want me to rule in your favor, I'm not concerned about whether or not the scientific basis for Dr. Wells' theories are reliable." Rather, the district court sought to inquire about the proposed "fit" between Dr. Wells' testimony and the eyewitness identifications in this case. A colloquy ensued between the district court and counsel for Hall regarding the specifics of Dr. Wells' testimony and its proposed relation to the eyewitness identifications. For example, counsel for Hall stated that Dr. Wells would testify regarding the correlation between a witness's confidence in making an identification and the resulting reliability of that identification. In response, the court asked, "[w]ho is the eyewitness that he is going to relate? What's the fit between

that testimony and our case?" Counsel then was provided with the opportunity to explain what he perceived to be the fit between Dr. Wells' testimony and the eyewitness identifications in this case. Thus, it is clear that the district court considered the second inquiry under *Daubert*—whether Dr. Wells' testimony would "assist the trier of fact" to understand the eyewitness identification evidence.

In summary, our review of the record indicates that the court made proper use of the framework established by *Daubert* in arriving at its decision to exclude Dr. Wells' testimony. The district court explicitly referenced the *Daubert* decision and addressed the two threshold inquiries regarding the reliability of the expert testimony and whether such testimony would assist the trier of fact in this case. Therefore, we turn to whether the district court abused its discretion in precluding Dr. Wells' testimony.

### B. *The District Court Exercised Discretion in Excluding Dr. Wells' Testimony*

When the district court's analysis satisfies the requirements of *Daubert*, we affirm its decision to preclude expert scientific evidence unless the decision constitutes an abuse of the court's discretion. *See General Elec. Co.*, 118 S.Ct. at 517, 118 S.Ct. 512; *Bradley*, 42 F.3d at 436–37; *Cella v. United States*, 998 F.2d 418, 422–23 (7th Cir.1993). We find no such abuse in this case. The district court found that Dr. Wells' testimony would not be helpful to the jury in assessing the reliability of the eyewitness identifications and, therefore, excluded Dr. Wells' testimony because it would not "assist the trier of fact" as Rule 702 requires.

Hall contends that the district court abused it discretion in excluding Dr. Wells'

---

3. We note in passing that the Eighth Circuit recently affirmed a district court's decision to bar a defendant from introducing expert testimony from Dr. Wells concerning his opinions on the reliability of eyewitness identifications on the ground that his testimony "fail[ed] to qualify as 'scientific knowledge' under *Daubert's* first prong." *See United States v. Kime*, 99 F.3d 870, 883 (8th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1015, 136 L.Ed.2d 892 (1997).

4. Where expert scientific evidence is properly excludable under the second prong of *Daubert*, the district court is not required to undertake an inquiry into the reliability of the proffered testimony. Since the district court can exclude *reliable* expert testimony under Rule 702, requiring the district court to first decide whether the proffered testimony satisfies *Daubert's* reliability prong would be a needless exercise.

testimony regarding the eyewitness identifications. First, Hall argues that the district court did not exercise discretion because the court was "led by the prosecutor to believe that it had no discretion under controlling Seventh Circuit caselaw to allow the defense expert to testify." Hall points to the following statement by the district court as illustrative of the court's belief that it lacked discretion:

> [I]t appears to me that it's not a question of whether or not there is a valid scientific basis for Dr. Wells' testimony but simply whether or not the Seventh Circuit believes that this type of testimony will aid the jury. And it seems to me all the Seventh Circuit case law says it will not, and for that reason the Court will not receive the testimony of Dr. Wells.

Second, Hall argues that we should reconsider our position that this type of testimony is inappropriate in light of *Daubert* and recent decisions by other circuits which have admitted such testimony in limited circumstances. In essence, Hall contends that this Court's line of cases amount to a per se ban of expert testimony pertaining to the reliability of eyewitness identifications and this ban offends the principles articulated in *Daubert*. We conclude, however, that the district court did exercise discretion in excluding Dr. Wells' testimony and we decline to reassess our position regarding the admissibility of this type of evidence.

### 1.

This Court has a long line of cases which reflect our disfavor of expert testimony on the reliability of eyewitness identification. *See, e.g., United States v. Daniels,* 64 F.3d 311 (7th Cir.1995); *United States v. Larkin,* 978 F.2d 964 (7th Cir.1992); *United States v. Curry,* 977 F.2d 1042 (7th Cir.1992); *United States v. Hudson,* 884 F.2d 1016 (7th Cir. 1989). We previously considered the issue in *United States v. Hudson.* In *Hudson,* the defendant offered expert testimony to show: (1) the effect of stress on eyewitness identification; (2) the problems associated with cross-racial identifications; (3) an overview of the memory process; and (4) the impact of a short viewing period upon the accuracy of an identification. 884 F.2d at 1023. In affirm-

ing the district court's decision to exclude the proffered expert testimony, we concluded that the district court need not determine whether expert testimony on eyewitness identification is sufficiently reliable to go to the jury because it is "properly excludable in any event under Rule 702 because it will not assist the trier of fact." *Id.* at 1024. In other words, "[s]uch expert testimony will not aid the jury because it addresses an issue of which the jury is already generally is aware, and it will not contribute to their understanding of the particular dispute." *Id.* Therefore, we held that the district court did not abuse its discretion in excluding the evidence as unhelpful to the jury. *Id.*

In *United States v. Curry,* we once again affirmed a district court's decision to exclude expert testimony on the issue of eyewitness identifications under Rule 702. 977 F.2d at 1051–52. Like Hall, the defendant in *Curry* sought to offer expert testimony on a number of factors relating to the accuracy of eyewitness identifications including: (1) witnesses often overestimate the duration of their observation of an individual; (2) a witness' confidence in his identification bears little or no relationship to the accuracy of that identification; (3) memory fades at a geometric rather than arithmetic rate; (4) post-event phenomena may affect original memory, and memory is easily distorted by leading questions or other manipulations; and (5) prior photographic identifications increase the likelihood that later in-person identifications will be erroneous. *Id.* at 1051. While we recognized that expert testimony generally is admissible under Rule 702 if it assists the trier of fact to understand the evidence, we reasoned that a district judge has broad discretion to exclude relevant evidence that is confusing or redundant under Rule 403. *Id.* at 1051–52. In fact, we noted that our Rule 702 analysis incorporates a consideration of the Rule 403 dangers—particularly the danger of unfair prejudice. *Id.* at 1051. That is, Rule 702 compels a district court to consider "whether the expert testimony would be misleading or confusing in the context of the trial." *Id.* While recognizing that expert testimony on eyewitness identification may not be totally unhelpful because a jury may not

understand all the intricacies of perception, retention, and recall, we nevertheless concluded that the district court's preclusion of the such evidence was a proper exercise of discretion whether under Rule 702 or 403. *Id.* at 1051–52. Buttressing our decision·in *Curry* was the fact that the eyewitness testimony was not the only evidence against the defendants and that the record revealed vigorous cross-examination by the defendant regarding the circumstances surrounding the identifications. *Id.* at 1052. In other words, the jury was alerted to the problems associated with eyewitness identification, including many of the factors that could affect perception, retention, and recall, despite the absence of expert testimony on the subject.

In later cases, we reaffirmed the principle that expert testimony relating to eyewitness identification is strongly disfavored. In *United States v. Larkin,* the district court denied a defendant's request to appoint an expert witness to testify about the undependability of eyewitness identification under stressful circumstances. 978 F.2d at 971. In affirming the district court's ruling, we explained, "expert testimony regarding the potential hazards of eyewitness identification—regardless of its reliability—will not aid the jury because it addresses an issue of which the jury already generally is aware, and it will not contribute to their understanding of the particular factual issues posed." *Id.* (citation and internal quotations omitted). Because the hazards of eyewitness identification are "well within the ken of most lay jurors" and counsel was "granted ample opportunity at trial to discuss those hazards and cast doubt upon the witnesses' eyewitness identification of his client," we concluded that the district court's decision not to appoint the expert witness requested was proper. *Id.*

Finally, in our most recent pronouncement on this issue, we affirmed a district court's denial of a defendant's request for the appointment of an expert to testify regarding the reliability of eyewitness identifications. *Daniels,* 64 F.3d at 315. The defendant in *Daniels* argued that the expert was neces-

sary to prepare his defense. Relying on the principles articulated in *Larkin* and *Hudson* that expert testimony regarding the potential hazards of eyewitness identifications will not assist the jury under Rule 702, we held that the district court properly exercised its discretion in denying Daniels' motion. *Id.*

██ In this case, the district court, relying on *Hudson, Larkin,* and *Daniels,* ·concluded that Dr. Wells' testimony regarding the reliability of the eyewitness identifications would not assist the jury and, therefore, excluded the testimony under Rule 702. Despite Hall's assertion to the contrary, we believe the district court recognized that it had the discretion to admit this testimony—and that the court exercised sound discretion by following and applying the principles articulated by this Court in reaching its decision to exclude Dr. Wells' testimony. While the government did argue to the district court at the hearing that it believed the court lacked discretion to admit the expert's testimony,[5] we believe that the record shows that the district court recognized that it was within the court's discretion to admit Dr. Wells' testimony. First, contrary to Hall's assertion, the district court did not automatically exclude Dr. Wells' testimony—rather it excluded the testimony only after having considered whether Dr. Wells' testimony would assist the trier of fact in this case. It would seem counter-intuitive for the district court to engage in an analysis of whether an expert's testimony on the reliability of eyewitness identification would assist the trier of fact if it is predetermined that all expert testimony on that topic is automatically excluded as unhelpful. Second, the record provides no indication that the district court believed there was an absolute bar to the admission of such evidence. To the contrary, the district court stated that·"[t]here seems to be this authority in the Seventh Circuit that it somewhat generally disapproves of expert witness testimony." *See also Curry,* 977 F.2d at 1052 ("[I]t is likely that it was within the discretion of the trial court to

---

**5.** The government stated: "I would suggest, your honor, that this circuit has already spoken on the issue. This testimony is simply not admissible, period, and having a *Daubert* hearing is a waste of this Court's time, because it's just not admissible. We, of course, would object to the testimony, and I think the case law clearly supports us ·on that."

allow the eyewitnesses expert testimony here, [but] we decline to hold that the court was required to do so.").

In sum, the record reveals that the district court considered the reliability and potential helpfulness of Dr. Wells' testimony, balanced the proffered testimony against cases in which we have expressed a strong disfavor towards the admission of such evidence, and concluded that Dr. Wells' testimony would not assist the trier of fact under Rule 702. For these reasons, we conclude that the District Court did not abuse its discretion in excluding Dr. Wells' testimony.

### 2.

■ Hall also contends that we should reassess our position regarding the admissibility of this type of evidence in light of *Daubert* and in light of recent developments in other circuits that now permit the admission of such testimony in limited circumstances. Implicitly, Hall argues that *Daubert* lowered the standard for admissibility of expert testimony dealing with eyewitness identification and, therefore, this Circuit's pre-*Daubert* cases excluding such testimony should no longer be followed. We conclude, however, that *Daubert* does not undermine our prior analysis of the admissibility of expert scientific testimony under Rule 702. Further, we do not believe our precedent conflicts with those decisions of other circuits which Hall contends are more open to the admission of this type of evidence. Therefore, we reject Hall's arguments.

### a.

As we mentioned previously, in *Daubert*, the Supreme Court established the approach a district court must take in determining the admissibility of expert scientific testimony under Rule 702. In so doing, the Supreme Court rejected the rigid test set forth in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), which required expert scientific testimony to be "generally accepted as reliable in the relevant scientific community" in order to be admissible, *see Daubert*, 509 U.S. at 584–87, 113 S.Ct. 2786, and adopted the more liberal standard embodied by Rule 702 that the expert need only testify to "(1) scientific

knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id.* at 592, 113 S.Ct. 2786. Because this Court has consistently affirmed district court decisions rejecting expert testimony pertaining to the reliability of eyewitness identifications on the basis that it will not "assist the trier of fact" under Rule 702, rather than because such testimony was unreliable under the *Frye* test, we conclude that *Daubert* leaves intact our pre-*Daubert* caselaw interpreting this issue. *See generally United States v. Smith*, 122 F.3d 1355, 1359 (11th Cir.) ("*Thevis* [a pre-*Daubert* decision] held that expert testimony regarding eyewitness reliability does not assist the jury, and we conclude that that holding is in harmony with *Daubert*. Therefore, it is as true after *Daubert* as it was before that a district court does not abuse it[s] discretion in excluding such testimony."), *cert. denied*, —— U.S. ——, 118 S.Ct. 614, 139 L.Ed.2d 500 (1997).

### b.

In addition, Hall argues that recent decisions by other circuit courts, which have admitted expert testimony on this topic in narrow circumstances, suggest it is time for us to revisit our position that the admission of such testimony is strongly disfavored. *See, e.g., United States v. Brien*, 59 F.3d 274, 277 (1st Cir.1995) (declining to adopt a blanket rule that qualified expert testimony on eyewitness identification must either be routinely admitted or excluded); *United States v. Amador–Galvan*, 9 F.3d 1414, 1417–18 (9th Cir.1993) (declining to follow per se rule excluding expert testimony regarding the credibility of eyewitness identification). We need not do so because a careful examination shows no inconsistency between our decisions and those relied upon by Hall. As we have previously stated, the district court has discretion under Rule 702 to admit or exclude expert testimony on witness identification. *See Hudson*, 884 F.2d at 1023–24; *see also Curry*, 977 F.2d at 1051–52 (noting that the district court has the discretion to admit expert testimony on eyewitness identifications). Likewise, the unifying principle of those cases cited by Hall is that expert testimony on eyewitness identification comes

within the scope of Rule 702 and, thus, should not be excluded automatically. *See, e.g., Brien*, 59 F.3d at 277 (concluding that its within the broad discretion of the trial court to admit or exclude expert testimony on eyewitness identification); *United States v. Rincon*, 28 F.3d 921, 923 (9th Cir.1994) (same). Thus, we believe that our position is consistent with these cases because most courts allowing such expert eyewitness testimony recognize that the determination of admissibility rests within the sound discretion of the district court.

### C. Additional Considerations

■ Our conclusion that the district court did not abuse its discretion in this case is further supported by three additional considerations. First, Hall had the opportunity to thoroughly cross-examine all of the eyewitnesses in order to cast doubt on their ability to identify him. As we have explained, any weaknesses in eyewitness identification testimony ordinarily can be exposed through careful cross-examination of the eyewitnesses. *See Larkin*, 978 F.2d at 971 (excluding proffered expert testimony, in part, because defendant's counsel had the opportunity at trial to discuss the potential hazards of eyewitness identification and cast doubt upon the witnesses' eyewitness identifications); *Curry*, 977 F.2d at 1052 (concluding that "vigorous cross-examination by the defendants," which revealed the weaknesses of the eyewitness identifications, made expert testimony on the identifications unnecessary); *see also United States v. Thevis*, 665 F.2d 616, 641 (5th Cir.1982) (concluding that expert testimony on eyewitness identification is properly excludable because the question of accuracy of perception and memory "can be adequately addressed in cross-examination and that the jury can adequately weigh these problems through common-sense evaluation"). Furthermore, we believe that the credibility of eyewitness testimony is generally not an appropriate subject matter for expert testimony because it influences a critical function of the jury—determining the credibility of witnesses. *See, e.g., United States v. Kime*, 99 F.3d at 884 (concluding that the "evaluation of eyewitness testimony is for the jury alone. It is the exclusive province of the jury to determine the believability of a witness.... An expert is not permitted to offer an opinion as to the believability or truthfulness" of a witness's story) (citation and internal quotations omitted).

■ Second, the district court properly gave the jury an instruction on the reliability of eyewitness identification to aid the jury in evaluating the eyewitness identification testimony introduced at trial. *See United States v. Anderson*, 739 F.2d 1254, 1258 (7th Cir. 1984) (finding that "[i]n cases where witness identification is an issue, the trial judge must, at the defendant's request, instruct the jury about eyewitness identification testimony"). Specifically, the district court cautioned the jury to consider: (1) the opportunity the witness had to observe the offender at the time in question and later to make a reliable identification; (2) the influences and circumstances under which the witness has made the identification; (3) the credibility of each identification witness; (4) whether the witness is truthful; and (5) whether the witness had the capacity and opportunity to make a reliable observation on the matter covered in the witness's testimony. These instructions adequately focused "the jury's attention on the reliability of the witness identifications and ... acquainted[ed] the jury with factors relevant in evaluating those identifications." *Id.* at 1258; *see also Rincon*, 28 F.3d at 925–26 (suggesting that the use of cautionary instructions which address many of the factors about which an expert would testify is an alternative way of educating jurors of the problems arising from eyewitness identifications). Thus, with the aid of cross-examination and cautionary instructions, we believe the jury was adequately focused on the issue of eyewitness identification and fully able to assess the ability of the eyewitnesses to perceive and remember.

■ Finally, it is important to note that there was substantial corroborating evidence to implicate Hall as the perpetrator of the crime. Generally speaking, the existence of corroborating evidence undercuts the need, except in the most compelling cases, for expert testimony on eyewitness identifications. *See Curry*, 977 F.2d at 1052; *see also Kime*,

99 F.3d at 885 (expressing the court's reluctance to find an abuse of discretion in precluding expert testimony on eyewitness identifications "unless the government's case against the defendant rested exclusively on uncorroborated eyewitness testimony") (citations and quotations omitted). In this case, the eyewitness identifications were of secondary importance to the government's case— the main evidence was Hall's confession to the crime.

Based on the considerations expressed above, we conclude that the district court's decision to preclude Dr. Wells' from testifying at trial was proper.

## II. EXCLUSION OF HEARSAY EVIDENCE CONCERNING OTHER SUSPECTS

■■■ Prior to trial, Hall filed a motion in limine seeking to admit numerous hearsay statements offered to show that someone other than Hall committed the kidnapping and murder of Jessica Roach. Hall argued to the district court that the various hearsay statements were admissible under Federal Rules of Evidence 803(2), 803(24), and/or 804(b)(3). In the alternative, Hall argued that he had a constitutional right to introduce the statements as a matter of due process under *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) and *Green v. Georgia*, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979). After a hearing during which the district court examined each of the proffered hearsay statements, the court orally ruled all the statements inadmissible. Hall now appeals those rulings.[6] We review a district court's decision that a particular hearsay statement is not admissible under an abuse of discretion standard. *See United States v. Sinclair*, 74 F.3d 753, 758 (7th Cir.1996); *United States v. Moore*, 791 F.2d 566, 570 (7th Cir.1986).

First, Hall argues that he should have been allowed to introduce various hearsay statements and suspicious acts of behavior attributed to Lester O'Toole to establish that he, rather than Hall, committed the crime. Specifically, Hall sought to offer the testimony of Jerry Brannin, who is married to

O'Toole's ex-wife. Brannin would have testified that O'Toole and his wife told him that they "had to get out of town because of the Jessica Roach abduction." Hall also sought to admit the statement of Jamie Wheeler, an acquaintance, who claimed that approximately two days after Jessica Roach's disappearance, O'Toole, while in the process of loading his van in the alley behind Wheeler's mother's home, said to Wheeler's mother: "Dee, I have to get out of town before the shit hits the fan." In addition, Hall sought to admit the statement of Eduardo Vela, another acquaintance, who claimed that O'Toole told him that "she'd be found in harvest time" in a cornfield in Indiana. Hall also sought to introduce evidence that O'Toole, like Hall, owned a van, which, according to O'Toole's brother-in-law, disappeared for three days sometime in September of 1993. His brother-in-law would further testify that when O'Toole returned, he washed the van, "something that he normally never did."

Hall also argues that he should have been allowed to introduce the confession of Keith Goble. Police investigated Goble after he went to the funeral home preparing for Jessica Roach's funeral and asked to see the body. In a subsequent interview with investigators, Goble stated that he picked up Jessica Roach, attempted to have sex with her, and then dropped her off by a cornfield in Indiana.

## A. *Admission of Statements under Federal Rule of Evidence 803(2)*

■■■ Hall first contends that the district court erroneously concluded that two of O'Toole's statements did not qualify as "excited utterances" under Rule 803(2). Specifically, Hall argues that O'Toole's statement to Jamie Wheeler's mother that "I have to get out of town before the shit hits the fan" and the statement to Jerry Brannin that O'Toole and his wife "had to get out of town because of the Jessica Roach abduction" should have been admitted as "excited utterances." Rule 803(2) allows hearsay testimony of "[a] state-

---

**6.** Because most of Hall's challenges to the district court's hearsay rulings are wholly without merit, in this opinion, we will address only those that warrant discussion.

ment relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Fed.R.Evid. 803(2). Under 803(2), a hearsay statement may be introduced into evidence as an "excited utterance" only if each of the following three conditions is met: (1) a startling event occurred; (2) the declarant makes the statement while under the stress of excitement cause by the startling event; and (3) the declarant's statement relates to the startling event. *United States v. Sowa*, 34 F.3d 447, 453 (7th Cir.1994); *Moore*, 791 F.2d. at 570.

We turn first to O'Toole's statement to Wheeler's mother that he had to leave town, which O'Toole allegedly uttered approximately two days after the disappearance of Jessica Roach. We conclude that the district court did not abuse its discretion in excluding this testimony. Even if we assume that the requisite "startling event" was the Roach abduction itself, the record contains ample support for the district court to conclude that neither the second nor third conditions were satisfied.

■ In order to conclude that a declarant made the statement while "under the stress of excitement caused by the event," the court must be able to determine that the "declarant's state at the time the declaration was made excluded the possibility of conscious reflection." *Moore*, 791 F.2d at 571–72. While the length of time between the startling event and when the statement is made is not dispositive, it certainly is relevant to a district court's inquiry into whether the declarant uttered the statement while still under the stress of excitement caused by the startling event. *Id.* at 572. According to Wheeler, O'Toole made the statement at least two days after Jessica Roach was abducted. Thus, even though Wheeler stated that O'Toole appeared pale and upset at the

time, we find that a lapse of time of several days between the event and the alleged statement militates against a finding of spontaneity so as to exclude the possibility of conscious reflection. More importantly, however, Hall failed to offer sufficient evidence to show that the statement related to the startling event. In fact, the district court noted that O'Toole "could have made the statement for any number of reasons not involving the Jessica Roach abduction." Based on these factors, we find that the district court did not abuse its discretion in concluding that Hall failed to qualify this statement for admission under Rule 803(2).

■ Nor can we conclude that the district court erred in excluding O'Toole's alleged statement to Brannin that O'Toole and his wife "had to get out of town because of the Jessica Roach abduction." First, Hall offers no evidence as to who uttered the statement—O'Toole or his wife. Second, Hall does not offer any evidence as to when the alleged statement was uttered. *See Sowa*, 34 F.3d at 453 (reasoning that a proponent must show that the statement "[was] made under such circumstances and so recently after the occurrence of the transaction as to preclude the idea of reflection or deliberation" (quoting *Gross v. Greer*, 773 F.2d 116, 120 (7th Cir.1985))). In light of these shortcomings, we cannot say that the district court abused its discretion in concluding that Hall failed to satisfy the three conditions necessary to qualify this statement as an "excited utterance" under 803(2).

### B. *Admission of Statements under Federal Rule of Evidence 803(24)*

■ At the hearing, Hall requested that Goble's confession and all of O'Toole's alleged statements be admitted under Rule 803(24),[7]

---

**7.** At the time of Hall's conviction, Federal Rule of Evidence 803(24) provided, in relevant part, that hearsay would not be excluded if it was:

 [a] statement not specifically covered by any of the foregoing exceptions *but having equivalent circumstantial guarantees of trustworthiness,* if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the

point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interest of justice will best be served by admission of the statement into evidence.

Fed.R.Evid. 803(24) (emphasis added). The residual exception contained in Rule 803(24) was transferred to new Rule 807 effective December

the "residual" exception. The district court refused to admit the confession or any of O'Toole's alleged statements, ruling that there had been an insufficient showing as to the "trustworthiness of the statements" to justify admission. Because we agree that neither Goble's confession nor O'Toole's alleged statements bore sufficient indicia of reliability to justify admission under 803(24), we hold that the district court did not abuse its discretion in excluding these statements.

▮▮▮▮ Under Rule 803(24), a hearsay statement must meet five requirements to be admissible: (1) circumstantial guarantees of trustworthiness; (2) materiality; (3) probative value; (4) the interests of justice; and (5) notice. *Moffett v. McCauley*, 724 F.2d 581, 583 (7th Cir.1984). Critical to the admission of a hearsay statement under 803(24) is a finding by the district court that the statement is trustworthy. *See id.*; *see also United States v. Romo*, 914 F.2d 889, 896 (7th Cir.1990) (concluding that statements which the district court finds not to have such guarantees of trustworthiness cannot be admitted under 803(24)). The district court excluded the proffered statements on the ground that they were untrustworthy. Because none of the other necessary requirements under the Rule were challenged as not being satisfied, on appeal, we need only address whether the statements contained "circumstantial guarantees of trustworthiness" as required under Rule 803(24).

▮▮▮▮ As stated, we review a district court's decision that a particular hearsay statement is not admissible under an abuse of discretion standard. *Sinclair*, 74 F.3d at 758. "Moreover, we have emphasized that trial courts have a considerable measure of discretion in deciding when a hearsay state-

ment fits the residual exception" of Rule 803(24). *Id.* (citations and internal quotations omitted). Therefore, a trial judge has considerable discretion in determining whether hearsay statements contain the necessary "circumstantial guarantees of trustworthiness," *United States v. Guinan*, 836 F.2d 350, 354 (7th Cir.1988), and we "will find an abuse in circumstances only where the trial court committed a clear and prejudicial error of judgment in determining whether a statement met the conditions for the application of the residual exception." *Sinclair*, 74 F.3d at 758–59. With respect to the statements proffered by Hall, we find no error in the district court's exercise of that discretion.

▮▮▮▮ We begin by noting that "[o]ut-of-court statements are generally inadmissible because they are presumed to be unreliable." *United States v. Hooks*, 848 F.2d 785, 796 (7th Cir.1988). Thus, the party "wishing to introduce hearsay evidence must rebut the presumption of unreliability by appropriate proof of 'trustworthiness.' " *Id.* In determining whether a statement is sufficiently reliable for purposes of Rule 803(24), a court should examine, among other factors: (1) "the probable motivation of the declarant in making the statement;" (2) "the circumstances under which it was made;" and (3) "the knowledge and qualifications of the declarant." *Cook v. Hoppin*, 783 F.2d 684, 690–91 (7th Cir.1986) (citation omitted). Similarly, in construing Rule 804(b)(5), we have identified several additional factors that may be considered in determining whether hearsay testimony has sufficient "guarantees of trustworthiness."[8] Some of these other factors which are relevant to the statements in this case include: (1) the character of the declarant for "truthfulness and honesty and

---

1, 1997. However, since the district court's ruling occurred prior to Rule 807's effective date, we review Hall's challenges under the former Rule 803(24).

**8.** As stated, in 1997, the contents of Rule 803(24) and Rule 804(b)(5) were combined and transferred to the new Rule 807. With the exception of the additional requirement under Rule 804(b)(5) that the declarant be unavailable, the text of the two former rules was virtually identical. The advisory committee's note to Rule 807 specifies that, in combining the two Rules, "[n]o

change in meaning [was] intended." Fed. R.Evid. 807 advisory committee's note. Thus, even though Hall sought admission of these statements under Rule 803(24), we believe the factors courts consider in determining whether a statement should be admitted under Rule 804(b)(5) are instructive in the context of Rule 803(24). *See United States v. Dunford*, 148 F.3d 385, 392 n. 2 (4th Cir.1998) ("[I]n light of the merger of [Rules 803(24) and 804(b)(5)] into new Rule 807, we find persuasive for purposes of applying Rule 803(24) precedent from Rule 804(b)(5).").

the availability of evidence on the issue;" (2) "whether the testimony was given voluntarily, under oath, subject to crossexamination and a penalty for perjury;" (3) "the extent to which the witness' testimony reflects his personal knowledge;" (4) "whether the witness ever recanted his testimony;" and (5) whether the declarant's statement was insufficiently corroborated. *United States v. Seavoy*, 995 F.2d 1414, 1418 (7th Cir.1993) (citation omitted). Although these factors are neither exhaustive nor necessary prerequisites for admissibility of hearsay under 803(24), they shed light on the sort of considerations a district court should take into account when evaluating the "trustworthiness" of a hearsay statement. In this case, the district court carefully examined Goble's confession and each of O'Toole's alleged statements and concluded that the evidence offered by Hall failed to establish the "trustworthiness" of the proffered statements.

In contending that Goble's confession was trustworthy, Hall simply argues that Goble's confession "had 'circumstantial guarantees of trustworthiness' equivalent to the circumstantial guarantees surrounding Larry Hall's confession." The district court, however, concluded that Goble's confession lacked "even the barest indicia of reliability." We agree. First, we have previously reasoned that the physical and mental condition of the declarant at the time a statement is made can be grounds for excluding the hearsay statement as inherently untrustworthy. *United States v. Wilkus*, 875 F.2d 649, 655 (7th Cir.1989). In this case, the district court had serious doubts about Goble's mental condition as it appeared that Goble was psychotic and he confessed to any crime he was questioned about by the police. In addition, Goble lacked knowledge regarding the pertinent facts of the case. Unlike the instant case, it became clear to investigators during the course of the police interview that Goble knew nothing about the specifics of the crime. Further, Goble's confession was insufficiently corroborated. Police thoroughly searched Goble's vehicle and failed to produce any evidence linking him to the crime. While there was also a corresponding lack of physical evidence tying Hall to the crime, there were no witnesses who could place

Goble at or near the scene of the abduction. In contrast, four eyewitnesses testified against Hall. In light of these considerations, we conclude that the district court did not abuse its discretion in concluding that Goble's confession was not sufficiently trustworthy to justify admission under Rule 803(24).

Hall also argues that statements O'Toole purportedly made regarding his involvement in the Jessica Roach abduction should have been admitted by the district court under Rule 803(24). Hall baldly asserts that these hearsay statements "had even greater 'circumstantial guarantees of trustworthiness' than [Goble's] confession, having been made to relatives and friends" and, therefore, should be admissible. We disagree.

Because it is the most probative hearsay testimony offered by Hall, we first turn to O'Toole's alleged statement to Eduardo Vela that he had disposed of Jessica Roach's body and that she would be found at harvest time in a cornfield in Indiana. Based on several factors, the district court found Vela's testimony regarding this statement unreliable. First, Vela's recollection was inconsistent as to when O'Toole supposedly made the statement—whether it was before or after the discovery of Jessica Roach's body. Only if it was before the discovery would the statement show that O'Toole possessed independent knowledge about the crime. Otherwise, because of the publicity following the Roach case, O'Toole may well have been aware that Jessica's body had been discovered when he allegedly made this statement. Second, the statement was insufficiently corroborated. Hall offered no physical evidence linking O'Toole to the crime, and the statement itself did not contain any specific details of the crime of which only the perpetrator would have knowledge. In addition, O'Toole denied making the statements and passed a polygraph examination regarding his involvement in the crime. Based on these considerations, we agree with the district court that this statement lacked "trustworthiness," and we conclude that the court did not abuse its discretion in excluding this statement.

■ With respect to the remaining statements attributed to O'Toole, we can dispense with them largely based on the same analysis expressed immediately above. None of the statements indicate that O'Toole had unique knowledge of the crime because the statements did not contain specific details of the crime unknown to the public at large. Aside from the hearsay statements themselves, O'Toole's additional statements are not corroborated by any physical evidence or eyewitness testimony. In addition, O'Toole recanted his statements and passed a polygraph examination in which he proclaimed his innocence. Finally, except for O'Toole's statement to Jamie Wheeler's mother about having to "get out of town before the shit hits the fan," the dates O'Toole allegedly made these statements cannot be established with any degree of reliability in relation to the discovery of Roach's body. Thus, we conclude that these factors clearly support the district court's conclusion that the proffered hearsay testimony lacked "trustworthiness." In sum, we cannot say that district court, relying on the factors expressed above, abused its discretion in concluding that Hall failed to show the "trustworthiness" of these statements such as to justify admission under Rule 803(24).

### C. Admission of Statements Under Federal Rule of Evidence 804(b)(3)

■ Hall also alleges that Goble's confession and all of O'Toole's alleged statements should have been admitted under Rule 804(b)(3) of the Federal Rules of Evidence,[9] the "statement against interest" exception. Under Rule 804(b)(3), a hearsay statement may be admitted at trial only if the proponent can satisfy the following three-part test: (1) the declarant's statements must have been against the declarant's interest; (2) corroborating circumstances exist which clearly indicate the trustworthiness of the declar-

ant's statement; and (3) the declarant must have been unavailable as a witness. *See United States v. Garcia*, 897 F.2d 1413, 1420 (7th Cir.1990). The district court excluded Goble's confession and all of O'Toole's statements because "the corroborating evidence does not clearly indicate the trustworthiness" of the statements. We agree. A district court's "determination of the trustworthiness of an out-of-court statement should be upheld unless the finding is clearly erroneous." *Id.* at 1421.

Unlike Rule 803(24), which contemplates the presence of corroborating circumstances as just one factor a court *may* consider in determining whether a statement has "circumstantial guarantees of trustworthiness," Rule 804(b)(3) *expressly* requires the exclusion of out-of-court statements offered to exculpate the accused unless there are corroborating circumstances that "clearly indicate" the trustworthiness of the statement. *Garcia*, 897 F.2d at 1420; *see also United States v. Silverstein*, 732 F.2d 1338, 1346 (7th Cir. 1984) (emphasizing that corroborating circumstances under 804(b)(3) must clearly indicate a proffered hearsay statement's trustworthiness). Thus, for the same reasons we determined that Goble's confession and O'Toole's statements were insufficiently corroborated under Rule 803(24), *see* Part II.C, *supra*, (the lack of physical evidence and eyewitness testimony tying the declarants to the crime, O'Toole's later recantation of his statements, the dates of most of the statements are largely unknown in relation to the discovery of the victim's body, and the fact that the statements themselves did not contain specific facts that only the perpetrator would have known), we also hold that Hall failed to show that sufficient corroborating circumstances existed that clearly indicated the trustworthiness of these statements under Rule 804(b)(3). *See Moore*, 936 F.2d at 1516–17 (applying the same reasoning in de-

---

9. Federal Rule of Evidence 804(b)(3) provides that hearsay will not be excluded if it is:

[a] statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. *A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.*

Fed.R.Evid. 804(b)(3) (emphasis added).

termining that a statement lacked "trustworthiness" under Rule 804(b)(3) and "circumstantial guarantees of trustworthiness" under 804(b)(5)); *see also, United States v. Groce,* 999 F.2d 1189, 1190–91 (7th Cir.1993) (concluding that a hearsay statement lacked trustworthiness under Rule 804(b)(3) where the declarant made conflicting statements and later recanted the version most favorable to the defendant); *Silverstein,* 732 F.2d at 1346–47 (concluding that mere opportunity and ability to commit crime to which hearsay declarant confessed is insufficient corroboration where the statement does not contain facts that only the perpetrator would have known and there was a lack of other evidence linking declarant to the crime). Therefore, we conclude that the district court did not commit clear error in refusing to admit Goble's and O'Toole's hearsay statements under Rule 804(b)(3).

## D. Admission of Statements under Constitutional Principles

■ Hall also alleges that he had a constitutional right to introduce the statements of O'Toole and Goble as a matter of due process under *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), and *Green v. Georgia,* 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979), because these statements would be considered sufficiently reliable for the government to use against the declarants in a criminal prosecution. Concluding that the statements were unreliable and that the government would not use such unreliable evidence to prosecute the declarants, the district court rejected Hall's argument that he had a constitutional right to introduce the statements. We agree with the district court.

In *Chambers,* the hearsay declarant gave a sworn statement to the defendant's attorneys confessing to the crime to which the defendant was charged and also admitted responsibility for that crime three other times in private conversations with friends. 410 U.S. at 287–88, 93 S.Ct. 1038. Reasoning that the "hearsay rule may not be applied mechanistically to defeat the ends of justice," *id.* at 302, 93 S.Ct. 1038, the Supreme Court held that the trial court's exclusion of this third party's

confessions on hearsay grounds violated the defendant's due process rights where circumstances revealed the confessions to be reliable. *Id.* In reaching this conclusion, the Supreme Court reasoned that the statements were made "under circumstances which provided considerable assurance of their reliability." *Id.* at 300, 93 S.Ct. 1038. These circumstances included: (1) each statement was made spontaneously to a close acquaintance shortly after the murder had occurred; (2) each statement was corroborated by some other evidence in the case whether it was the declarant's sworn confession, eyewitness testimony or evidence linking the declarant to the murder weapon; (3) each statement was against the declarant's interest; and (4) the declarant was available to be cross-examined under oath about his out-of-court statements. *Id.* at 300–01, 93 S.Ct. 1038.

Similarly, in *Green,* the defendant sought to admit the testimony of a third party who had testified for the government at the co-defendant's trial. 442 U.S. at 96, 99 S.Ct. 2150. The third party testified that the co-defendant admitted that he had committed the murder for which the defendant was being charged and that the defendant was not present. *Id.* The Supreme Court found several reasons existed to assume the hearsay testimony's reliability, including: (1) the declarant made the statement spontaneously to a close friend; (2) there was ample evidence corroborating the confession; (3) the statement was against interest; (4) and the government considered the testimony sufficiently reliable to use it against the co-defendant. *Id.* at 97, 99 S.Ct. 2150. Based on these circumstances, the Supreme Court found the hearsay statement reliable and held that the exclusion of reliable hearsay testimony of a co-defendant offered to exculpate the defendant violated the defendant's due process rights. *Id.*

We have since recognized *Chambers* and *Green* to stand for the proposition that "states must allow defendants to put *reliable* third-party confessions before the jury, despite the hearsay rule, when necessary to assist in separating the guilty from the innocent." *Carson v. Peters,* 42 F.3d 384, 385 (7th Cir.1994) (emphasis added); *see also Lee*

*v. McCaughtry,* 933 F.2d 536, 538 (7th Cir. 1991) (*"Chambers* did not do away with the hearsay rule. The Supreme Court contemplated that the judge would be a gatekeeper, that unreliable statements could be excluded."). As we have previously indicated, "[w]e have understood *Chambers* and *Green* as establishing the rule that 'if the defendant tenders vital evidence the judge cannot refuse to admit it without giving a better reason that it is hearsay.'" *Carson,* 42 F.3d at 387 (quoting *Rivera v. Director,* 915 F.2d 280, 281–82 (7th Cir.1990)). However, if the district court *"does* give a 'better reason,' then *Chambers* and *Green* have served their purpose." *Id.* A better reason was given in this case—the statements were unreliable.

Unlike the statements in *Chambers* and *Green,* the hearsay statements involved in this case were not made under circumstances that provided considerable assurance of their reliability. As we examined in detail in Parts II.B and II.C above, there was insufficient evidence corroborating these statements. In addition, Goble's and O'Toole's statements were neither sworn nor used against either declarant in a criminal proceeding.

Relying on our decision in *Rivera v. Director,* 915 F.2d 280 (7th Cir.1990), Hall nevertheless argues that Goble's confession and O'Toole's statements should have been admitted under *Chambers* because they are the sort of statements that prosecutors regularly use against defendants. We disagree. In *Rivera,* the defendant sought to introduce the confession of his co-defendant, a confession which was placed into evidence against the co-defendant at his separate trial and which contributed to the co-defendant's ultimate conviction. *Rivera,* 915 F.2d at 281. In that confession, the co-defendant stated that he alone committed the crime. *Id.* The trial court excluded the confession from the defendant's trial on the basis that under applicable state law the availability of the out-of-court declarant for cross-examination is necessary for the admission of hearsay evidence. *Id.* Perhaps recognizing the vulnerability of the state's ruling on constitutional grounds, during oral argument in *Rivera,* the government provided a different reason for excluding the confession—that it was unrelia-

ble. *Id.* at 282. As a factor in determining the reliability of the co-defendant's confession in a trial against the defendant, we reasoned that, if the "confession was reliable enough to be used to put [the co-defendant] away for the rest of his life," it should be "reliable evidence of [the defendant's] innocence as well." *Id.* Because the government offered no plausible reason for believing that the exculpatory portion of the confession was unreliable, and because *Chambers* dictates that a statement may not be excluded merely by classifying it as hearsay, we reversed and granted the defendant a new trial. *Id.* at 281–83.

Contrary to Hall's assertions, *Rivera* does not stand for the proposition that *any* statement that *could* be used by a prosecutor against the declarant is sufficiently reliable to justify admission under *Chambers.* Rather, *Rivera* merely recognizes that where the government does in fact introduce a statement at trial and uses it to secure a conviction against the declarant, a court should not later preclude a co-defendant from offering that statement in his trial merely on the basis that the statement is hearsay. Since neither O'Toole nor Goble were even charged in this case, *Rivera* does not undermine the district court's conclusion that the hearsay statements were unreliable and, therefore, inadmissible.

In sum, we conclude that Hall's constitutional due process rights were not violated by the district court's decision not to admit the hearsay statements.

### III. PROSECUTOR'S COMMENTS ON POTENTIAL DEFENSE ALIBI WITNESSES IN ITS OPENING STATEMENT

 Hall's next challenge is that he was denied a fair trial when the prosecutor began "speculating" in the government's opening statement about alibi witnesses the government expected Hall would call to testify on his behalf and the evidence the government would offer to rebut such testimony. Because we conclude that any potential harm from the prosecutor's comments regarding potential alibi witnesses was mitigated by cautionary instructions from the district court to the jury as well as the prosecutor's

own prefatory statements, we reject Hall's argument that the district court abused its discretion in denying his motion for a mistrial.

During the government's opening statement, the prosecutor stated that he expected the defense to present alibi evidence and that he would offer rebuttal evidence to discredit those alibis. Hall timely objected on the grounds that the prosecutor's remarks would have the effect of shifting the burden of proof to Hall. The district court overruled Hall's objection on the grounds that the prosecutor had a good faith basis for believing the alibi evidence would be presented and allowed the prosecutor to continue. The prosecutor suggested that Hall's father might testify that he was with Hall in Wabash, Indiana, on September 20, 1993, the date of the abduction. The prosecutor stated, "[i]f they do that, . . . we will present evidence in rebuttal that the father falsified two documents to support that fact." The prosecutor also suggested that Hall's brother might testify that he was with Hall at an event in Rochester, Indiana on September 19, 1993. In that event, the prosecutor would "present evidence to suggest that the brother told the FBI that it was possible that Larry Hall was in Georgetown on September 20, 1993." At the conclusion of the opening statements, the defendant requested a mistrial. The district court denied that motion. Hall never called his father or brother to testify at trial on his behalf.

 We review the manner in which a district court conducts a trial for abuse of discretion. *Testa v. Village of Mundelein, Ill.,* 89 F.3d 443, 445 (7th Cir.1996). "A trial judge has broad discretion in deciding whether, in the context of the entire trial, a defendant's motion for a mistrial should be granted." *United States v. Mealy,* 851 F.2d 890, 902 (7th Cir.1988).

As we have previously stated, the "purpose of an opening statement is to state what evidence will be presented, to make it easier for the jurors to understand what is to follow, and to relate parts of the evidence and testimony to the whole." *Testa,* 89 F.3d at 446. We begin by noting that at the time of his opening statement, the prosecutor had a

reasonable basis for believing that Hall would introduce this alibi evidence. The alibi testimony the prosecutor referenced in its opening statement was admitted in Hall's first trial and the prosecutor had every reason to expect that it would be introduced in this trial. In fact, Hall filed a notice of alibi in which he gave notice "that he will present the same alibi evidence and witnesses as in the original trial."

 However, even in the unique circumstances presented by this case, we have serious doubts as to the appropriateness of a prosecutor commenting on potential alibi witnesses of a defendant. We believe it to be a rare situation where it would be appropriate for a prosecutor to comment on anticipated defense evidence because a defendant is under no obligation to put forward evidence on his or her own behalf. As Hall correctly points out, when the prosecution raises the spectre of a flawed alibi and the defendant chooses not to offer any alibi evidence, it may well leave the jury with an unfavorable impression of the defendant. In any event, whether it was improper for the prosecutor to comment on potential alibi witnesses under the facts of this case is an issue we need not reach in order to dispense with Hall's appeal because improper prosecutorial remarks standing alone cannot justify a new trial unless they "undermined the fairness of the trial and contributed to a miscarriage of justice." *United States v. Young,* 470 U.S. 1, 16 n. 14, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985); *see also Mealy,* 851 F.2d at 903 (recognizing that "even if the prosecutor engaged in improper conduct, we must re-examine the improper remark in light of the entire record to determine whether the remark deprived the defendant of a fair trial") (citations and internal quotations omitted). We conclude that the prosecutor's comments, improper or not, were not so prejudicial as to deny Hall a fair trial.

"We will not lightly overturn a conviction 'on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial.'" *United States v. Saadeh,* 61 F.3d

510, 521 (7th Cir.1995) (quoting *Young,* 470 U.S. at 11, 105 S.Ct. 1038). In determining whether the prosecutor's remarks amount to prejudicial error, a court "must consider the probable effect the prosecutor's behavior would have on the jury's ability to judge the evidence fairly." *Young,* 470 U.S. at 12, 105 S.Ct. 1038. A careful review of the record in this case discloses that the prosecutor's comments did not have a prejudicial effect on the fairness of the trial.

As an initial matter, we note that the district court cautioned the jury prior to opening arguments that opening statements are not to be considered evidence and that the government bears the burden of proof. The prosecutor also attempted to blunt the potential prejudicial impact that might result from his remarks. The prosecutor prefaced his comments on the potential alibi evidence by stating:

> First of all, I really don't know with precision what evidence they will offer, and keep in mind that they certainly don't have to bring any evidence forth at all. The burden of proof is completely on me. They don't have to prove or disprove anything.

The prosecutor closed his opening statement with the reminder that "[t]he burden to prove beyond a reasonable doubt that Larry Hall is guilty is totally upon me, and that's a burden I fully and freely accept." In addition, after ruling on defense counsel's initial objection to the prosecutor's statements, the district court addressed the jury and gave them instructions to reduce the potential prejudice of the prosecutor's references to the potential alibi witnesses in the event that Hall decided not to call them.[10] *See generally Testa,* 89 F.3d at 445 (reasoning that the

exercise of a trial court's discretion "includes determining whether giving a cautionary instruction, rather than ordering a mistrial, can prevent any possible prejudice"); *United States v. McClellan,* 868 F.2d 210, 217 (7th Cir.1989) ("A trial judge has broad discretion in determining when a cautionary instruction, as opposed to a mistrial, can prevent any possible prejudice."). Similarly, the court's final jury instructions stressed that "[o]pening statements, closing arguments and other statements of counsel should be disregarded to the extent they are not supported by the evidence." Since we "assume that the jury followed the court's cautionary instructions," *see Mealy,* 851 F.2d at 903, we have no reason to believe (and nothing in the record suggests) that the jury relied on the prosecutor's statements, or any inference to be drawn therefrom, in reaching its verdict. Thus, from the record, it appears that every effort was made to limit the prejudicial effect of the prosecutor's comments on Hall's decision not to tender alibi evidence. Moreover, the prosecutor's brief remarks were made in a trial that lasted seven days and in a case in which the evidence was more than sufficient to sustain a conviction.

In light of the foregoing considerations, we conclude that, while the district court may well have erred in allowing the prosecutor to comment on this matter in its opening statement, the prosecutor's comments were not so prejudicial as to deny Hall a fair trial. Therefore, the district court did not abuse its discretion in denying Hall's motion for a mistrial.

### IV. OTHER EVIDENTIARY MATTERS

█ Defendant's remaining arguments warrant only brief attention. Hall next as-

---

10. The district court instructed the jury as follows:

> Members of the jury, this is very unusual to have opening statements interrupted like this, but as I indicated to you before, opening statements are not evidence. It's the opportunity the lawyers have to give some you some idea of what they expect the evidence to be. And [the prosecutor] properly said the defendant is presumed to be innocent. He doesn't have to present any evidence in his defense. So, therefore, at this point in time [the prosecutor] does not know whether or not the defendant will

> present any evidence at all, but he has a reason to believe that they may present certain evidence which he has suggested to you, and he's indicating what he believes that evidence will be if they choose to present it, and what the government's evidence will be in response to it. I have ruled that he may do that, but I'm just letting you know that simply because he is taking this view as to what they may present to you, they are not required to present it. They're not required to present any evidence, and you're not to infer anything if the defendant chooses not to present any evidence.

serts that the district court committed reversible error when it allowed the government to present certain rebuttal evidence. A significant part of Hall's defense was his claim that he gave a false confession. In support of this theory, Hall offered expert psychiatric testimony to establish that he falsely confessed due to certain personality disorders that made him more susceptible to suggestion and more eager to please. In rebuttal, the government introduced an expert to testify that those same characteristics associated with Hall's particular personality disorders are often found in sex offenders.

■ "It is well established that the admission of rebuttal evidence lies within the sound discretion of the trial court and appellate courts will not interfere with the trial court's ruling unless there is a clear abuse of discretion." *Mercado v. Ahmed,* 974 F.2d 863, 872 (7th Cir.1992) (quoting *United States v. Gaertner,* 705 F.2d 210, 217 (7th Cir.1983)). We find the rebuttal evidence offered by the government was a proper means of refuting Hall's contention that his confession was false. Thus, we find no abuse of discretion here.

■ Hall also alleges that the district court denied him a fair trial when it precluded him from introducing, during the cross-examination of a government eyewitness, a group picture showing Hall together with his twin brother. The exhibit was offered to show how similar Hall and his twin brother looked when dressed in Civil War attire—the same clothing Hall wore while in Georgetown on September 19. Hall contends that the inability to introduce the group photo at this time forced him into a "Hobson's choice" of either foregoing that evidence altogether or calling the government witness who placed Hall in the Georgetown area the day before Jessica Roach's disappearance in Hall's own case-in-chief. Hall asserts that by calling a government witness to lay the foundation for this exhibit he would be forced to rehash the government's evidence.

■ We begin by noting that we review that manner in which a district court conducts a trial for abuse of discretion. *Testa,* 89 F.3d at 445. "The trial court has wide discretion in managing cross-examination and ruling upon admission of evidence." *United States v. Wilson,* 985 F.2d 348, 351 (7th Cir.1993). We find no abuse of discretion here as Hall was free to introduce this picture during his own case-in-chief. In addition, we note that the district court permitted Hall to introduce a photograph of Hall's brother during cross-examination of that same witness. Thus, we believe that the district court provided Hall with a sufficient opportunity to show the jury that he and his twin brother looked similar. Furthermore, there is nothing in the record which indicates that the district court would have allowed the government to exceed the scope of Hall's direct examination of a government witness called merely to lay the foundation for this exhibit. Based on these considerations, we conclude that the district court did not abuse its discretion in excluding the group photo during the government's case-in-chief.

■ Hall's final challenge on appeal is that the district court abused its discretion by precluding him from asking leading questions of a government witness Hall recalled to the stand in his case-in-chief. Hall contends that he should have been allowed to ask leading questions of the witness under Rule 611(c) of the Federal Rules of Evidence, which provides, in part, that when a party calls a "witness identified with an adverse party, interrogation may be by leading questions." Fed.R.Evid. 611(c). We find this argument to be equally without merit. The district court has the discretion to allow or disallow leading questions of a witness identified with an adverse party, and once the district court "exercises his discretion in that regard, [the movant] must establish an abuse of discretion to obtain a reversal." *United States v. O'Brien,* 618 F.2d 1234, 1242 (7th Cir.1980). Hall had the opportunity to fully cross-examine the witness in the government's case-in-chief, and on appeal he fails to show what information he sought to elicit through leading questions. Thus, we conclude that the district court did not abuse its discretion.

For the foregoing reasons the judgment of the district court is AFFIRMED.

EASTERBROOK, Circuit Judge, concurring.

At Hall's first trial, the district court excluded expert testimony that Hall is especially vulnerable to suggestive interrogation. The judge thought that jurors have experience with questioning and can figure this subject out for themselves, but we observed: "Because the fields of psychology and psychiatry deal with human behavior and mental disorders, it may be more difficult at times to distinguish between testimony that reflects genuine expertise—a reliable body of genuine specialized knowledge—and something that is nothing more than fancy phrases for common sense. It is nevertheless true that disorders exist, and the very fact that a layperson will not always be aware of the disorder, its symptoms, or its consequences, means that expert testimony may be particularly important when the facts suggest a person is suffering from a psychological disorder.... The court indicated that it saw no potential usefulness in the evidence, because it was within the jury's knowledge. This ruling overlooked the utility of valid social science. Even though the jury may have had beliefs about the subject, the question is whether those beliefs were correct. Properly conducted social science research often shows that commonly held beliefs are in error." 93 F.3d 1337, 1343, 1345 (7th Cir.1996). On remand, the district court inquired whether the testimony would be scientifically valid and reliable, see *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), answered "yes," and admitted the evidence. 974 F.Supp. 1198 (C.D.Ill.1997). But the district court excluded expert testimony about eyewitness identification, observing that jurors have experience with observation and memory and can figure this subject out for themselves. Hall contends that the court has committed the same error a second time.

The district judge relied on *United States v. Daniels*, 64 F.3d 311 (7th Cir.1995), and its predecessors. *Daniels* states that "[e]xpert testimony regarding the potential hazards of eyewitness identifications ... will not aid the jury because it addresses an issue of which the jury already generally is aware, and it will not contribute to their understanding of the particular factual issues posed." 64 F.3d at 315. *United States v. Hudson*, 884 F.2d 1016, 1024 (7th Cir.1989), and *United States v. Larkin*, 978 F.2d 964, 971 (7th Cir.1992), say the same thing. These decisions do not address the point the prior panel in this case made: "Properly conducted social science research often shows that commonly held beliefs are in error." Jurors who *think* they understand how memory works may be mistaken, and if these mistakes influence their evaluation of testimony then they may convict innocent persons. A court should not dismiss scientific knowledge about everyday subjects. Science investigates the mundane as well as the exotic. That a subject is within daily experience does not mean that jurors know it *correctly*. A major conclusion of the social sciences is that many beliefs based on personal experience are mistaken. The lessons of social science thus may be especially valuable when jurors are sure that they understand something, for these beliefs may be hard for lawyers to overcome with mere argument and assertion.

Another line of cases in this circuit, which *Hudson*, *Larkin*, and *Daniels* do not cite or discuss, is more open to the possibility that expert testimony may be especially valuable when the subject is "common knowledge." In *Carroll v. Otis Elevator Co.*, 896 F.2d 210 (7th Cir.1990), for example, the court held it proper to admit the testimony of a psychologist about how colors influence children's behavior. A concurring opinion in *Carroll* elaborated: "In principle, a product could be unreasonably dangerous because its designers neglected to consider how children see things. A specialist in vision, illusion, and reaction is just the sort of person to assist on such questions. The manufacturer observes that expert testimony is inappropriate when the subject lies within the ken of laymen and insists that 'everyone knows' red is attractive. Maybe, but much of the science of experimental psychology consists in demonstrating that what 'everybody knows' is false." 896 F.2d at 215. Our opinion in *Krist v. Eli Lilly & Co.*, 897 F.2d 293 (1990), is in the same vein. "An important body of psychological research undermines the lay intuition that confident memories of salient

experiences ... are accurate and do not fade with time unless a person's memory has some pathological impairment.... The basic problem about testimony from memory is that most of our recollections are not verifiable. The only warrant for them is our certitude, and certitude is not a reliable test of certainty. Many people are certain that God exists. Many are certain that He does not exist. The believer and the nonbeliever are equally certain, but they cannot both be correct. Similarly, the mere fact that we remember something with great confidence is not a powerful warrant for thinking it true. It therefore becomes an empirical question whether and in what circumstances memory is accurate." 897 F.2d at 296–97 (citations to the scholarly literature omitted). See Elizabeth F. Loftus & James M. Doyle, *Eyewitness Testimony: Civil and Criminal* (3d ed.1997). *Krist* suggested that a litigant could present expert testimony about "the vagaries of memory", 897 F.2d at 298, and remarked on the tension between *Hudson* and *Carroll*. Courts elsewhere are divided, though recent opinions have been more hospitable than *Hudson* and *Daniels* to the possibility of expert testimony about perception, memory, and identification. E.g., *United States v. Brien*, 59 F.3d 274, 277 (1st Cir. 1995) (collecting cases); *United States v. Stevens*, 935 F.2d 1380 (3d Cir.1991).

My colleagues finesse the subject by concluding that a district judge has discretion to assess the utility of evidence under Rules 403 and 702, and to admit or exclude it as circumstances require. This is, in the end, all that *Daniels, Larkin,* and *Hudson* hold: that the district judges in those cases had not abused their discretion, *General Electric Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997), by excluding particular evidence. See *Krist*, 897 F.2d at 298. I agree with this conclusion and join the opinion. But I am inclined to think that *Daniels* is right to suggest that evidence of this kind should not be admitted—though not for the reason *Daniels* gives.

Much of the adversarial system rests on empirical propositions that may be investigated, and sometimes refuted, through scientific means. Consider, for example, the proposition—fundamental to any system that relies on lay adjudicators—that jurors understand and follow the instructions given by the court. It may be that jurors don't understand legalese, or if they understand the instructions don't follow them. See *Free v. Peters*, 12 F.3d 700 (7th Cir.1993); *Gacy v. Welborn*, 994 F.2d 305 (7th Cir.1993); Neil Vidmar, *The Performance of the American Civil Jury: An Empirical Perspective*, 40 Ariz. L. Rev. 849 (1998) (recapitulating evidence about this issue). Or consider cross-examination. Jurors may believe that witnesses who hesitate, perspire, or fidget during cross-examination are hiding the truth. This is the view that underlies polygraph examinations, but without the precision of measurement. Is it true? Calm and collected liars deceive polygraph examiners (and thus jurors too); other witnesses grow restless or testy although they have nothing to hide. Suppose one of the litigants offers an expert in physiology to explain to jurors the (weak) correlation between lying and the appearance of discomfort on the stand. Or an expert in group dynamics to explain to a potential dissenter on the jury how to resist the pressure of the majority to go along—or for that matter how to see through lawyers' rhetorical tricks. Because trials rest on so many contestable empirical propositions, including those about eyewitness recollection, it always would be possible to offer expert evidence along these and related lines.

Yet a trial *about the process of trials* not only would divert attention from the main question (did Hall kill Jessica Roach?) and substantially lengthen the process but also would not do much to improve the accuracy of the outcome. Social science evidence is difficult to absorb; the idea of hypothesis formulation and testing is alien to most persons. That's one reason why the training of social scientists is so extended. Delivering a graduate level statistical-methods course to jurors is impractical, yet without it a barrage of expert testimony may leave the jurors more befuddled than enlightened. Many lawyers think that experts neutralize each other, leaving the jurors where they were before the process began. Many lawyers think that the best (= most persuasive) experts are those who have taken acting lessons and have deep voices, rather than those who have done the best research. Perhaps

that is too pessimistic a view; but then the effect of experts is *itself* a question open to empirical inquiry, which might be added to the agenda for trial.

Instead of using the trial process to assess trials at retail, judges can and should employ social science to *improve* the trial process. Lessons about how jurors respond to jury instructions can be used to draft better instructions. (The Federal Judicial Center's pattern instructions were drafted with the aid of social scientists; so were this circuit's pattern criminal instructions.) Recognition that jurors cannot (and do not) always heed judges' instructions to disregard what they have heard, or to consider evidence against one litigant but not another, leads courts to prevent the use of certain kinds of evidence or to sever the proceedings. E.g., *Gray v. Maryland,* 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998). Linguists and other experts could help jurors to interpret statutes, but judges do that task instead and give the results to the jury. Similarly a judge, recognizing the main conclusions of the scholarly study of memory—that "accuracy of recollection decreases at a geometric rather than arithmetic rate (so passage of time has a *highly* distorting effect on recollection); accuracy of recollection is *not* highly correlated with the recollector's confidence; and memory is highly suggestible—people are easily 'reminded' of events that never happened, and having been 'reminded' may thereafter hold the false recollection as tenaciously as they would a true one", *Krist,* 897 F.2d at 297 (emphasis in original)—could block a lawyer from arguing that a given witness is *sure* of his recollection, and therefore is more likely to be right. The judge could inform jurors of the rapid decrease of accurate recollection, and the problem of suggestibility, without encountering the delay and pitfalls of expert testimony. Jurors are more likely to accept that information coming from a judge than from a scholar, whose skills do not lie in the ability to persuade lay jurors (and whose fidgeting on the stand, an unusual place for a genuine scholar, is apt to be misunderstood). Altogether it is much better for judges to incorporate scientific knowledge about the trial process *into* that process, rather than to make the subject a debatable issue in every case. There remains a question about where

judges acquire scientific knowledge, for they too may be mistaken in what they think they know. Still, professional adjudicators who attend continuing judicial education programs and read the scholarly literature are more likely to absorb the lessons of science than are jurors force fed a little information during a trial.

Hall did not ask the judge to pass scientific knowledge on to the jury. His lawyers did not appreciate the big difference between the expert evidence considered on the first appeal and the evidence offered on remand. The evidence we dealt with the last time around was evidence *about Hall,* suggesting that his psychological makeup was abnormal, not evidence about how ordinary witnesses interact with the trial process itself. Or, to put this in the language of administrative law, the expert testimony in the first trial was about an adjudicative fact; the proposed expert testimony in the second trial would have concerned a legislative fact. Hall did not object to any line of questioning or argument as incompatible with the lessons of science. So the possibilities I have been exploring are not presented in this case. But the subject is vital to a judicial system that seeks to improve the accuracy of the trial process, and thus as time passes more of the findings of modern social science research should be incorporated into legal rules about proper trial tactics and arguments.