BOLGER, Justice,
with whom STOWERS, Justice, joins, dissenting in part.
I. INTRODUCTION
I agree with the general legal framework the court uses to decide this case. I am troubled, however, by the court's conclusion that Carmela Bacod's statement to Detective Huelskoetter was so trustworthy that the superior court Was required as a matter of law to admit it under Alaska Evidence Rule 804(b)(5).[1] Even considering corroborating evidence, I would hold that Bacod's statement does not evince the "cireumstantial guarantees of trustworthiness" required for admission under Rule 804(b)(5), and I would affirm the superior court's evidentiary ruling. In the alternative, I would remand to allow the superior court to exercise its discretion in making this determination under this court's newly announced standard.[2]
II. DISCUSSION
The court adopts nine "[plarticularly significant relevant factors"[3] for determining *433 whether a proffered hearsay statement, despite failing to meet any of the enumerated hearsay exceptions, is nevertheless sufficient ly trustworthy to be admitted into evidence.[4] The court concludes that "at least five" of these factors favor the statement's admission.[5] But for the reasons discussed below, I am not persuaded by the court's analysis, and I would conclude that, on the record before us, only one of these nine factors-the recording of the statement-unambiguously favors admission, while the remaining eight cither cut against the statement's trustworthiness or provide little insight into the trustworthiness of the statement.
A. Motivation To Speak Truthfully
The court concludes that "Bacod's statement provides no reason to believe she was speaking insincerely in an effort to help [Ryan] Sanders." [6] But while I agree that Bacod had no reason to lie for Sanders; Bacod's broader motivations for speaking with Detective Huelskoetter remain unknown,. If anything, Bacod's statement suggests that Bacod contacted Detective Huel-skoetter partly to determine what the police knew about the shooting,[7] and it is undisputable that she changed her account in real time in response to what she learned.[8] This casts some doubt on the idea that Bacod called Detective Huelskoetter for the civie-minded purpose of providing a truthful statement to help the police with their investigation, I would therefore conclude that this factor weighs neither for nor against finding Bacod's statement sufficiently trustworthy,
B. Spontaneity
In discussing spontaneity, the court focuses primarily on the fact that Bacod initiated the call to Detective Huelskoetter and states that the detective's questions to her were "open-ended." [9] But though it is tre that much of Bacod's statement was made in response to open-ended questions, the most relevant portion-Bacod's claims about Travis Moore's intent [10]-was obtained through the detective's leading questions. Bacod never independently stated (or even implied) that Moore was the ringleader of the alleged assault. She indicated this only by affirmatively answering two very leading questions: (1) "So ... you know that [Moore] wanted to beat [Sanders] up over the money?" and (@) "[Wlhen they were goin' over there[,][it] was pretty much the idea ... that [Moore] was gonna beat him up?" [11] I do not think that Bacod's responses to the detective's leading questions on this critical issue can be considered spontaneous, and I would conclude that this factor weighs against the t1ustworth1— ness of Bacod's statement.
C,. - Under Oath
Bacod's statement was not sworn testimony. Accordingly I would conclude that this factor weighs against the statement's trustworthiness.
*434 D. Crosg-examination
Bacod's statement was not subjected to thorough cross-examination. Although Detective Huelskoctter asked several leading questions, none was particularly pointed or intended to cast doubt on Bacod's truthfulness, as the State's questions would have been had Bacod been able to testify at trial. Indeed, cross-examination would have been particularly helpful in clarifying this particular statement, because it might have shed light on whether Richards actually told Bacod that the alleged conspirators were planning to "jump" and "beat ... up" Sanders or merely indicated an intent to "talk" with him. Because the State was unable to press Bacod on this point, I would conclude that this factor weighs against the trustworthiness of Ba-cod's statement.
F. Relationship
The court. concludes that Bacod's decision to talk to a police officer investigating the deaths of two friends strongly favors the trustworthiness of Bacod's statement.[12] The court also notes that knowingly providing false information to the police could have subjected Bacod to eriminal lability.[13] And elsewhere in its analysis, the court suggests that Bacod's statement was more trustworthy because she made it in the: presence of her mother.[14] But as a general matter, I suspect police officers and parents of teenagers would be skeptical of the court's reasoning, since it is not uncommon for individuals to lie to the police, or teenagers to their parents, And as noted above, the idea that Bacod was highly motivated to tell the truth-either by the death of her friends or by the potential for criminal Hability-is somewhat belied by the fact that she changed her account halfway through her statement.
For these reasons, I would conclude that the relationship between Bacod and Deteec-tive Huelskoetter provides, at best, weak support for trustworthiness. I do not think there is enough information in the record about Bacod's relationship with her mother and with Detective Huelskoetter (or police officers in general) to support the conclusion that these relationships "strongly favor" her statement's trustworthiness,
F. Recantation Or Reaffirmation
There is no evidence to suggest Bacod recanted or reaffirmed her statement after talking with Detective Huelskoetter, and she died before the evidence of her statement came to light. As already noted, however, Bacod walked back a critical part of her account-namely, that Moore, Richards, Ket-zler, and Porterfield intended to assault Sanders-midway through her statement. Although it seems likely that Bacod's reason for changing her narrative was to protect Ketzler and Porterfield onee she learned they had been present at Sanders's house during the shootings, Bacod's shift of narrative was indisputably a "partiall ] backtrack," [15] as the court puts it, or a partial recantation, as I would put it, For this reason, I would conclude that this factor weighs against finding Bacod's statement trustworthy.
. Recording
Bacod's statement was recorded. As the court correctly concludes,[16] this weighs in favor of the statement's trustworthiness.
H. Firsthand Knowledge
The court notes that Bacod had firsthand knowledge of her conversation with Richards, which seems indisputable.[17] Nevertheless, I am not persuaded that this factor favors admissibility. - It is difficult to imagine proffered evidence of hearsay within hearsay where the out-of-court declarant will not *435 have firsthand knowledge of the second de-clarant's statement, so this factor would appear to support the admission of hearsay within hearsay in most cases, But each level of hearsay compounds the risk that the original statement was miscommunicated or misunderstood, and a factor that usually or always favors the admission of hearsay within hearsay seems an unreliable 1ndleator of whether the statement is trustworthy Therefore, while firsthand knowledge (or lack thereof) seems a particularly relevant factor in determining whether a typical hearsay statement should be considered reliable,[18] I would conclude that this factor has little or no weight in determining the trustworthiness of hearsay-within-hearsay statements, including Bacod's.
I. Corroborating Evidence
Finally, the court concludes that corroborating evidence supports the trustworthiness of Bacod's statement. The court highlights Bacod's identification of Moore, Richards, Ketzler, and Porterfield early in her statement without prompting from Detective Huelskoetter.[19] And the court notes that the four friends had three weapons in their possession the night of the shootings: (1) Richards's push knife, (2) the machete i in the car, and (8) Moore's unloaded pistol.[20]
alleged conspirators provides minimal corroboration for Bacod's statement, since Ba-cod's statement suggests that the friends regularly spent time together, and Bacod did not actually know whether Ketzaler and Port-erfield visited Sanders the night of the shootings. Moreover, Bacod's identification of her friends does not corroborate the critical portion of Bacod's statement; her explanation for why those friends visited Sanders's apartment, But the fact that Bacod could 1dentify the
Likewise, the existence of the three weapons adds little corroborative force 'to Bacod's statement. The. push knife and machete are conditionally relevant only if the weapons were intended to 'be used to assault Sanders,[21] but there is no evidence of such intent. To the contrary, Richards never brandished the push knife and the machete remained in the car.[22] And while Moore's pistol provides some corroboration for the general thrust -of Bacod's statement, the weapon's ' existence rebuts the portion of Bacod's statement that specifically addresses Moore's relationship W1th firearms. When asked whether she had ever observed Moore with a gun, Bacod re— sponded: "No, ... no.. I can't 1magme [Moore] with a gun." [23] Bacod further speculated that Ketzler was the only one of the alleged conspirators who miight have had a gun, but there is no evidence in the record suggesting that Keétzler possesséd a firearm either on the night of the shootings or in general.
> For these reasons, I do not share the court's confidence that Bacod's identification of the group of friends who visited Sanders on the night of the shoot1ngs~or the existence of the friends' three weapons-significantly corroborates Bacod's statement,. I would conclude that the corroborating evidence here provides only weak support for the statement's trustworthiness.
IIH. CONCLUSION.
I disagree with the court's conclusion that Bacod's statement was sufficiently trustworthy to be admissible under Rule 804(b)(5), and I am especially troubled by the_ court's holding that Bacod's 'statement was so trast worthy that it must be admltted as a matter of law.[24]
*436 The court attempts to narrow the breadth of this holding by stating that the residual hearsay exceptions apply "only on rare occasions," should not be treated as "invitations to discard the general prohibition on the admission of hearsay," and must be applied on a "case-by-case" basis.[25] But litigants both criminal and civil-will no doubt cite this case to support the admission of hearsay statements under the residual hearsay exceptions,. - And Bacod's unsworn, telephonic statement seems less trustworthy than evidence from sworn affidavits or in-person interviews if such evidence can be partially corroborated. Though the court has not previously held that these types of hearsay evidence should be admissible at trial, I fail to see why today's ruling will not lead to the regular admission of such statements.
I fear the court will come to regret its expansion of the residual hearsay exceptions, and I respectfully dissent.
APPENDIX
Anchorage Police Department Transcript
Q-DETECTIVE M. HUELSKOETTER
A-CARMELA BACOD
A. Everything happened, and she told me, like, actually it's been goin' on for like, about two weeks now, Um, the-Ryan SANDERS (Phonetic), he stole money from one of our friends, and they wanted to go beat him up to get the money back, 'cause it was pretty much a lot of money, and I think that's what like, triggered it (clears throat) to happen.
Q. Do you know who, uh-which friend had the money stolen?
A. I don't know her last name. I've met her just one time. Her name is RAVEN (Phonetic), though.
Q. Okay. So, what-what exactly do you know about the s-stealing of the money?
A. Um, well, ASHLEE (Phonetic) told me, uh, like about a week and a half ago, she told me on the phone that hi-her, RAVEN, and TRAVIS (Phonetic), and TRA-
VIS's fiancée SHERRELL, (Phonetic) and RYAN were all hangin' out, and then RYAN ended up the one only awake. Everyone was sleeping and they woke up with money gone, and they were guessing it was him, 'cause he was the only one awake, and he was gone when they came-when they woke up.
Q. Humph.
A. So, they assumed that he had stolen the money and ASHLEE told me that she heard around that RYAN had bought, ub, marijuana and alcohol and other drugs with the money.
Q. Uh-huh.
BACKGROUND NOISE
A. - So, that's what I've heard.
BACKGROUND NOISE
Q. Okay. Do you-do you know of any other, uh, bad blood between RYAN and TRAVIS and that group? Any other things goin' on? *
BACKGROUND NOISE
A. Um, I don't know RYAN-I've never met RYAN, but his name sounds really familiar, and I've known TRAVIS for a couple months, and I've known ASHLEE, she-she was my best friend, and I've known her since third grade.
Q. Okay.
A. But, that was pretty much what she told me.
Q. So, what did ...
A. She ...
Q. ... they tell you about, uh, wanting to go, uh, beat them up over this? I mean, what specifically do you know about that? What was the plan?
BACKGROUND NOISE
A. (Clears throat) Um, actually he had-he wanted to hang out with them ...
He, as in TRAVIS? Q.
A. Uh, RYAN. He wanted to hang out with all of us. I was supposed to go with them to their house ...
Q. Oh, okay.
*437 A. ... that night, (Clears throat) Um, I really don't know, like-oh, I ean't think right now.
Q. Okay.
A,. Sorry.
Q. So-but you know that TRAVIS wanted to beat RYAN up over the money?
BACKGROUND NOISE
A. Yeah. -.
BACKGROUND NOISE
Q. And that when they were goin' over there that was pretty much the idea, is that TRAVIS was gonna beat him up?
BACKGROUND NOISE
A,. Yeah. Um, were you there at the scene?
Q. I've-I was at the scene.
BACKGROUND NOISE
A. Was, uh-was it just ASHLEE and TRAVIS alone?
Q. I-I'm sorry?
A. Like, um, was there other people with TRAVIS and SHERRELL, like-I mean, ASHLEE?
Q. Yeah. There were. .
A. Were there two females there?
Q. Yes.
BACKGROUND NOISE
Q. So, do you know somethin' about that?
A. Well, um,, RAVEN, she's a Native. I don't know if that was one of her females, but, she had long hair .. .
Q. 'Kay. .
A. . that's RAVEN. SHERRELL’S a Black female.
Q. Uh-huh.
A. She was, uh, TRAVIS's fiancée, |
Q. Okay.
BACKGROUND NOISE
A. Um, ASHLEE Just told me that they wanted the money back, and then they were gonna jump 'em for it. But, ub, she told me that earlier they tried before or something like that, and RYAN's brother got mad or something and pulled a gun on RAVEN's face, or something like that. I don't know. She didn't tell me much about that.
Q. So, uh, [your] name's CARMELA, is - that right?
BACKGROUND NOISE
A. Yes.
BACKGROUND NOISE
Q. So, now, just let me see if I understand correctly, that you knew that kinda the plan was that TRAVIS and his girlfriend and ASHLEE and-and some other girl named RAVEN were gonna go over there and essentially jump them to get their money back?
Not-not jump, like, you know, like, talk. |
Okay. They were ..." ©
But ... p
. gonna try to talk . . obviously ... > p
.. it out, or ... $
. they're young, so, you know, there's gonna be violence in it. >
Okay. $
But, I couldn't stop them. p
Right. So, they-they-I mean basically the only reason they were going over there was to get the money back. ©
BACKGROUND NOISE
A. Probably.
Q. Okay. Alright.
BACKGROUND NOISE
@. Um, you ever see TRAVIS with a gun?
BACKGROUND NOISE
A. No, he-no. I can't imagine TRAVIS with a gun.
Q. You can't imagine TRAVIS with a gun?
A. No. He's so nice.
Q. Is he?
BACKGROUND NOISE
Q. (Sighs) Um, who on that side would-would have had a gun?
BACKGROUND NOISE
A. Definitely not ASHLEE.
Q. Okay.
BACKGROUND NOISE
Q. Anyone else that you can think of that m1ghta had a gun?
BACKGROUND NOISE -
*438 A. TI can't really, like-I don't know RAVEN that much, but probably she could. I've only met her once.
Q. Okay.
A. -And I don't know her, _,
BACKGROUND NOISE
Q. Okay I-is there anythmg else that, uh
[[Image here]]
BACKGROUND NOISE
Q. ... you think I should know? |
BACKGROUND NOISE
| A. That's-I told you everything I know.
Q. Okay, CARMELA, what's your last name?
BACKGROUND NOISE
BACOD. Can you spell ... oy
B ... .. that? B as in boy ... Uh-buh. . A~C-O-D as in dog. >rereyr
B~A—C—O—D‘? o
BACKGROUND NOISE
Q. BACOD?
A. Yeah.
Q. What's your date of birth?
A. [Bacod provided her date of birth]
BACKGROUND NOISE
Q. Um, and how do I get a hold of you again, just call this number?
BACKGROUND NOISE
A. This is my mor's cell phone.
Okay. You have your own cell phone, then? Q
A. Yeah.
Q. Okay, And, uh, is that, uh, [Detective Huelskoetter®: recited Bacod's phone number]?
BACKGROUND NOISE
A. Yeah.
Q. Okay.
BACKGROUND NOISE
Q. And where do ya live?
BACKGROUND NOISE
A. Um, [Bacod provided her home address]
[[Image here]]
[[Image here]]
Q. ... Alright, If, ub, if I have any other questions, can I, uh, give you a call back or come see you?
BACKGROUND NOISE
A. Yeah.
Q. Okay. And, ub, do you have somethin' to write my name and number down with?
BACKGROUND NOISE
A. Mom; can I get a pen?
Q. 'Cause I'll give you my direct number.
BACKGROUND NOISE
A. Okay.
Q. Okay, my first name is MARK.
BACKGROUND NOISE
Q. My last name, F'll spell it for you, 'cause it's really long. It's spelled H-U-E-L-8S-K-O-E-T-T-E-R.
BACKGROUND NOISE
Q. And my telephone ngmber is [Detective Huelskoetter provided his phone num-berl
BACKGROUND NOISE
Okay. Okay? ©
Thank you. >
So, if you think of anything that-that I should know about, will you please give me a call? A. Yes. $
Alright, well thank you very much, 0
You're welcome. yr
We'll talk to you later. Alright. po
'Bye. e
'Bye. »p
BACKGROUND NOISE
RECORDER SHUTS OFF
END OF PHONE CONTACT

. Op. at 426, 431.

. See Patterson v. GEICO Gen. Ins. Co., 347 P.3d 562, 568 (Alaska 2015) ("We ... review the superior court's application of the evidence rules ... for abuse of discretion.").

. See Op. at 428.

. The court adopts eight of these factors from 2 Grorex E. Dix ar a.., McCormick on Evipencre § 324, at 565-66 (Kenneth S. Broun ed., 7th ed.2013) and analyzes evidence of corroboration as a final, standalone factor. See Op. at 428-31.

. Op. at 428.

. Op. at 429 (emphasis added).

. Specifically, Bacod asked Detective Huelskoet-ter:
® [Were you there at the scene?"
e "Was ,... it just [Richards] and [Moore] alone?"
* "[Wlas there other people with [Moore] and . [Richards]? ... Were there two females there?"

. Bacod initially indicated that' Travis Moore, Ashlee Richards, Raven Ketzler, and Sherrell Porterfield wanted to "jump" and "beat ... up" Sanders, but she later said "[tlhey were ... gonna try to talk ... it out." '- '

. Op. at 429.

. Moore's intent was important and perhaps critical to the admissibility of Bacod's statement, as the court notes. Op. at 421-22.

. Moreover, this second question would have been objectionable if it had been asked at trial because Bacod had no personal knowledge of Moore's state of mind at the moment "when [the alleged conspirators] were goin{g]" to Sanders's apartment. '

. Op. at 430.

. Op. at 430.

. Op. at 429.

." See Op. at 436.

. See Op. at 428.

. See Op. at 430. The court also notes that Bacod had close ties with Richards and knew the identities of the other three alleged conspirators. Id. For the reasons discussed in the next section, however, I am unpersuaded that this corroborating evidence supports the trustworthiness of Ba-cod's statement.

. See United States v. Hall, 165 F.3d 1095, 1111 (7th Cir.1999) (holding third-party suspect's confession unreliable where it was "clear" that suspect "knew nothing about the specifics of the crime").

. Op. at 430.

, Id. at 430.

. See Alaska R. Evid., 104(b).

, Indeed, Sanders was not aware of either weapon, and the superior court concluded they were irrelevant and 1nadmlss1b1e

. It also seems odd that Moore would take an unloailed weapon to Sanders's house if he intended to assault Sanders. '

. See Op. at 431.

, See Op. at 428-29.